## THE JAMESBURG.

(District Court, E. D. Pennsylvania. March 1, 1915.)

### No. 37.

COLLISION ⬤⟳74—MOVING AND MOORED VESSELS.

    A collision between a loaded car float being shifted by a tug into an adjoining slip and a tug tied up beyond another tug at the end of the pier *held*, on the evidence, due solely to the fault of the moving tug; it not being satisfactorily shown that she signaled the other tugs to move, and it appearing that unless so warned they were moored in a proper and customary place.

    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 104; Dec. Dig. ⬤⟳74.]

In Admiralty. Suit for collision by Charles L. Walker, managing owner of the tug Lizzie Crawford, against the tug Jamesburg. Decree for libelant.

J. Frank Staley and T. Wistar Brown, 3d, both of Philadelphia, Pa., for libelant.

Joseph D. McCoy and John Hampton Barnes, both of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. The collision for which the libelant seeks to recover damages occurred off the end of Pier 10 South Wharves on the Delaware river on the morning of November 18, 1911. The weather was clear, the tide flood, and there was little, if any, wind.

Prior to the collision, the Crawford made fast to the tug Alert,. which was tied up to the end of. the pier, both vessels lying with bows, down. the river. When the Crawford tied up, her master went ashore to the offices of the managing owner of the tug, leaving a deck hand, Lingo, in charge, with the engineer, two firemen and cook on board. Lingo was not a licensed tug pilot, but had been following the water for 32 years, had been about tugboats on the Delaware river about 28 years, and during that time had served as deckhand and cook. While the Crawford was lying outside the Alert, the Jamesburg went into the dock between Pier 9 and Pier 10 and made fast to the starboard or up-river side of a car float loaded with two tiers of five freight cars each, for the purpose of taking it into the slip below Pier 10. The Crawford is about 67 feet in length, 17½ feet beam; the Jamesburg 82 feet in length and 18 feet beam, and the car float she had in tow was about 207 feet in length and 35 feet beam. The Jamesburg made fast to the float with one line on the third cleat from the stern, and, after having cleared the corner of the wharf, pushed the float out into the stream. Her master saw the tugs tied to the end of the pier, but proceeded to push the float around, thinking that the Crawford would move out of the way. Seeing that the float was not going to clear the Crawford, he signaled to stop and back, and, while the engines of the Jamesburg. were going full speed astern, the float struck the Crawford about amidships on her port side, causing some damage.

The libelant claims that the collision was due to the fault of the Jamesburg: First, in negligent and unskillful handling of the float; and, second, in not keeping a proper and efficient lookout. I do not find the latter claim sustained by the evidence.

The respondent denies fault upon the part of the Jamesburg, and alleges fault upon the part of the Crawford in failing to move away from the end of the pier upon receiving signals from the Jamesburg's whistles. There can be no doubt from the testimony that those in charge of the Jamesburg knew before going into the dock of the presence of the Alert and Crawford at the end of the pier. The witnesses for the respondent all testified that a third vessel, the Minerva, was also tied to the end of the pier above the Alert, and moved away when signals were blown. This evidence is immaterial, excepting as proof that signals were blown, as the movements of the Minerva, if she was there, have no other bearing upon the collision. The witnesses for the respondent testified that the Jamesburg blew warning signals, and that, upon the signals being given, the Alert went off downstream, casting the Crawford adrift, and that the Crawford drifted against the float; while those witnesses for the libelant who were on board the Crawford and a steward, who was on board the Alert, testified that no whistles were blown, that the Alert was fast to the pier, and the Crawford fast to the Alert at the time of the collision.

As the steward of the Alert was an independent witness, not connected with either the Crawford or Jamesburg, his testimony should have considerable weight. The testimony of the master and crew of the Jamesburg is contradicted by a report made by the master of the Jamesburg to the government steamboat inspectors immediately after

the collision, stating that on the morning in question he had collided with the tug Crawford, "which was lying at the end of Pier 10." This statement, made immediately after the collision, is entitled to greater weight than the contradictory testimony given several years after the collision, and after the matter had in all probability been frequently discussed by the master and crew of the vessel.

Upon this conflicting evidence, in view of the weight of the evidence, I find that the Crawford was lying tied up to the Alert at the end of the pier when the collision occurred. If there were no other circumstances in the case, the presumption in favor of the moored vessel would entitle the Crawford to full damages; and, without the force of the presumption, the evidence shows, and the master of the Jamesburg admits, that the float could without any difficulty have been taken further out, pushed downstream, and brought into the dock, without endangering the Crawford.

It is not claimed by the respondent that the Crawford was lying where she had no right to be, as it was shown to be customary for tugs to tie up at the end of Pier 10. It appears, however, from the testimony of all the witnesses for both parties who were questioned upon the matter, that there was an established local custom for tugs lying at the end of the pier to vacate immediately upon being signaled to do so by tugs bringing floats around the pier, as the Jamesburg was doing. All the witnesses for the respondent testified that warning whistles were blown by the Jamesburg while coming out of the dock, while the witnesses for the libelant with equal unanimity testified that they did not hear any whistles. If the signals were blown, the Crawford, in accordance with the custom of local navigation, should have moved away, and this could no doubt have been done if Lingo, the deckhand in charge, was qualified to take her from the pier. While he was not a licensed pilot, it appears that after the collision he took her across the river to shallow water, and consequently could have taken her away from the pier. He was washing the upper deck, in full view of the Jamesburg and float, but testified that he did not see them until the float struck the Crawford. If in his position he had heard the whistles, he would have had his attention immediately called to the presence of the Jamesburg; and if he had had warning in sufficient time, and had not then taken measures to move her out of the way, the Crawford would have been guilty of contributory fault.

The positive testimony that signals were blown would be persuasive, if the weight of the evidence did not force the conclusion that the respondent's witnesses were mistaken upon the question of the movement of the Alert and the question of the Crawford remaining tied up at the time of the collision. If signals were blown, and the Alert and Minerva moved away, there is no explanation of the absence of witnesses from the Alert and Minerva to corroborate the testimony of the master and crew of the Jamesburg. As the weight of the evidence has been found against the respondent's contention, the conclusion must be drawn that no warning signals were blown for the tugs to leave the pier, and therefore there was no neglect to act which would hold the

libelant guilty of contributory fault. The entire fault for the collision must therefore be placed upon the respondent.

A decree will be entered accordingly, with a reference to a commissioner to take testimony and report upon the amount of the libelant's damages.